

**U.S. Department of Justice**

*United States Attorney*
*District of New Jersey*

---

*Catherine R. Murphy*
*Assistant United States Attorney*

*970 Broad Street, Suite 700*
*Newark, New Jersey 07102*

January 25, 2021

**VIA ECF**

Honorable Peter G. Sheridan
United States District Judge
District of New Jersey
Clarkson S. Fisher Building & U.S. Courthouse
Trenton, New Jersey 08608

      Re:   *United States v. Richard Scalea*
             Crim. No. 18-620

Dear Judge Sheridan:

      The Government respectfully submits this letter brief in opposition to defendant Richard Scalea's ("Scalea") request for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) (the "Motion"). ECF Nos. 25, 27.[1] The Government submits that the Court should deny the Motion, as Scalea has failed to demonstrate any extraordinary or compelling reasons for compassionate release, and the 18 U.S.C. § 3553(a) factors, specifically the seriousness of his offense and the need for him to serve a full sentence to deter him and others adequately, strongly weigh against such relief.

**I.    Background**

      On October 16, 2018, Scalea pleaded guilty to a one-count Information charging him with distribution of child pornography, in violation of Title 18, United States Code, Sections 2252A(a)(2)(A) and 2252A(b)(1). ECF 17. As is discussed in more detail below, the investigation in the instant case revealed that Scalea distributed child pornography through an incest chatroom—in which he claimed to be raping his granddaughter—and had in his possession hundreds of images of child pornography, including images depicting the

---

[1] On or about October 1, 2020, Scalea filed a *pro se* motion for compassionate release (ECF 25). On January 11, 2021, Assistant Federal Public Defender David Holman filed an application for compassionate release on behalf of Scalea (ECF 27), which was intended to supplement Scalea's October 2020 *pro se* filing.

sexual abuse or exploitation of an infant or toddler, images depicting prepubescent minors, and an image portraying sadistic or masochistic conduct, as well as more than 500 chat messages that law enforcement bookmarked as related to crimes against children. On February 20, 2019, the Court sentenced Scalea to a term of imprisonment of 120 months and 10 years of supervised release (ECF 23).

Scalea is serving his sentence at FCI Fort Dix. According to the Bureau of Prisons ("BOP"), and assuming Scalea earns all of his possible good time credit, Scalea has served only approximately 38.5% of his sentence and has an estimated release date of on or about April 13, 2026. Not counting good time credit, he has served approximately 32.8% of his total sentence and will complete his entire term on or about October 5, 2027.

## II.     The Bureau of Prison's Response to the COVID-19 Pandemic

As this Court is well aware, COVID-19 is an extremely dangerous illness that has caused many deaths in the United States in a short period of time and that has resulted in massive disruption to our society and economy. In response to the pandemic, the Bureau of Prison's ("BOP") has taken significant measures to protect the health of the inmates in its charge. BOP has explained that "maintaining safety and security of [BOP] institutions is [BOP's] highest priority." BOP, Updates to BOP COVID-19 Action Plan: Inmate Movement (Mar. 19, 2020), *available at* https://www.bop.gov/resources/news/20200319_covid19_update.jsp.

Indeed, BOP has had a Pandemic Influenza Plan in place since 2012. BOP Health Services Division, Pandemic Influenza Plan-Module 1: Surveillance and Infection Control (Oct. 2012), *available at* https://www.bop.gov/resources/pdfs/pan_flu_module_1.pdf. That protocol is lengthy and detailed, establishing a multi-phase framework requiring BOP facilities to begin preparations when there is first a "[s]uspected human outbreak overseas." *Id.* at i. The plan addresses social distancing, hygienic and cleaning protocols, and the quarantining and treatment of symptomatic inmates.

Consistent with that plan, BOP began planning for potential coronavirus transmissions in January. At that time, the agency established a working group to develop policies in consultation with subject matter experts in the Centers for Disease Control, including by reviewing guidance from the World Health Organization.

On March 13, 2020, BOP began to modify its operations, in accordance with its Coronavirus (COVID-19) Action Plan ("Action Plan"), to minimize the risk of COVID-19 transmission into and inside its facilities. Since that time, as

events require, BOP has repeatedly revised the Action Plan to address the crisis.

BOP's operations are presently governed by Phase Nine of the Action Plan. The current modified operations plan requires that all inmates in every BOP institution be secured in their assigned cells/quarters, in order to stop any spread of the disease. Only limited group gathering is afforded, with attention to social distancing to the extent possible, to facilitate commissary, laundry, showers, telephone, and computer access. Further, BOP has severely limited the movement of inmates and detainees among its facilities. Though there will be exceptions for medical treatment and similar exigencies, this step as well will limit transmissions of the disease. Likewise, all official staff travel has been cancelled, as has most staff training.

All staff and inmates have been and will continue to be issued face masks and strongly encouraged to wear an appropriate face covering when in public areas when social distancing cannot be achieved.

Every newly admitted inmate is screened for COVID-19 exposure risk factors and symptoms. Asymptomatic inmates with risk of exposure are placed in quarantine for a minimum of 14 days or until cleared by medical staff. Symptomatic inmates are placed in isolation until they test negative for COVID-19 or are cleared by medical staff as meeting CDC criteria for release from isolation. In addition, in areas with sustained community transmission, all facility staff are screened for symptoms. Staff registering a temperature of 100.4 degrees Fahrenheit or higher are barred from the facility on that basis alone. A staff member with a stuffy or runny nose can be placed on leave by a medical officer.

Contractor access to BOP facilities is restricted to only those performing essential services (e.g. medical or mental health care, religious, etc.) or those who perform necessary maintenance on essential systems. All volunteer visits are suspended absent authorization by the Deputy Director of BOP. Any contractor or volunteer who requires access will be screened for symptoms and risk factors.

Social and legal visits were stopped as of March 13, and remain suspended at this time, to limit the number of people entering the facility and interacting with inmates. In order to ensure that familial relationships are maintained throughout this disruption, BOP has increased detainees' telephone allowance to 500 minutes per month. Tours of facilities are also suspended. Legal visits will be permitted on a case-by-case basis after the attorney has been screened for infection in accordance with the screening protocols for prison staff.

Further details and updates of BOP's modified operations are available to the public on the BOP website at a regularly updated resource page: www.bop.gov/coronavirus/index.jsp.

In addition, in an effort to relieve the strain on BOP facilities and assist inmates who are most vulnerable to the disease and pose the least threat to the community, BOP is exercising greater authority to designate inmates for home confinement. On March 26, 2020, the Attorney General directed the Director of the Bureau of Prisons, upon considering the totality of the circumstances concerning each inmate, to prioritize the use of statutory authority to place prisoners in home confinement. That authority includes the ability to place an inmate in home confinement during the last six months or 10% of a sentence, whichever is shorter, *see* 18 U.S.C. § 3624(c)(2), and to move to home confinement those elderly and terminally ill inmates specified in 34 U.S.C. § 60541(g). Congress has also acted to enhance BOP's flexibility to respond to the pandemic. Under the Coronavirus Aid, Relief, and Economic Security Act, enacted on March 27, 2020, BOP may "lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement" if the Attorney General finds that emergency conditions will materially affect the functioning of BOP. Pub. L. No. 116-136, § 12003(b)(2), 134 Stat. 281, 516 (to be codified at 18 U.S.C. § 3621 note). On April 3, 2020, the Attorney General gave the Director of BOP the authority to exercise this discretion, beginning at the facilities that thus far have seen the greatest incidence of coronavirus transmission. As of this filing, BOP has transferred 20,781 inmates to home confinement since March 2020. *See* Federal Bureau of Prisons, COVID-19 Home Confinement Information, *available at* https://www.bop.gov/coronavirus/.

Taken together, all of these measures are designed to mitigate sharply the risks of COVID-19 transmission in a BOP institution. BOP has pledged to continue monitoring the pandemic and to adjust its practices as necessary to maintain the safety of prison staff and inmates while also fulfilling its mandate of incarcerating all persons sentenced or detained based on judicial orders.

In addition to the proactive safety measures the BOP has undertaken, outlined above, the United States has made great advancement in the development, authorization, and distribution of effective vaccines to combat the transmission of COVID-19. To date, two different vaccines have been approved for distribution, and distribution efforts are ongoing. On December 30, 2020, the BOP released the following statement regarding their efforts concerning the administration of vaccines:

> BOP advises that it is working with the Centers for Disease Control and Prevention (CDC) and a public-private partnership established by the federal government, known as Operation Warp Speed (OWS),

- 4 -

to ensure the BOP receives the COVID-19 vaccine as it becomes available….At present, as vaccines are obtained, priority is given to full-time staff members, in order to mitigate the risk of staff members introducing the virus from the community. At each institution, any additional available vaccines are given to inmates, beginning with those deemed at high risk.

To date, 24,750 vaccine doses have been distributed to the Bureau of Prisons nationwide. Of that amount, 20,838 have been administered. *See* Center for Disease Control, *COVID-19 Vaccinations in the United States*, *at* https://covid.cdc.gov/covid-data-tracker/#vaccinations.  FCI Fort Dix began administering the COVID-19 vaccine to staff on January 19, 2021.  *See* Declaration of James Gibbs, Acting Warden of FCI Fort Dix, at ¶ 2 (marked as Exhibit C).  As the rollout of the vaccines continues, the availability of a vaccine to inmates will be more widespread.

Unfortunately and inevitably, some inmates have become ill, and more likely will in the weeks ahead. But BOP must consider its concern for the health of its inmates and staff alongside other critical considerations. For example, notwithstanding the current pandemic crisis, BOP must carry out its charge to incarcerate sentenced criminals to protect the public. It must consider the effect of a mass release on the safety and health of both the inmate population and the citizenry. It must marshal its resources to care for inmates in the most efficient and beneficial manner possible. It must assess release plans, which are essential to ensure that a defendant has a safe place to live and access to health care in these difficult times. And it must consider myriad other factors, including the availability of both transportation for inmates (at a time that interstate transportation services often used by released inmates are providing reduced service), and supervision of inmates once released (at a time that the Probation Office has necessarily cut back on home visits and supervision).

As mentioned above, Scalea is serving his sentence at Fort Dix FCI.  As of on or about January 20, 2021, according to information the Government received from BOP, there were a total of 69 positive inmate cases of Covid-19, and no Covid-19 deaths at FCI Fort Dix.[2]

---

[2] According to the BOP website, as of January 21, 2021, there were 120 positive inmate cases.  The discrepancy between Fort Dix's internal reporting and the numbers reported on the BOP website is because there is a lag time between when an inmate is actually "recovered" and when an entry can be made into each inmate's electronic record to document the recovery.  *See* Exhibit C.

### III. Scalea Has Exhausted His Administrative Remedies

Scalea appears to have exhausted his administrative remedies, as statutorily required. A court may grant a defendant's own motion for a reduction in his sentence *only* if the motion was filed "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf" or after 30 days have passed "from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(A).

BOP records show that on or about August 13, 2020, Scalea requested compassionate release/reduction in sentence based on medical circumstances, specifically, "asthma, high blood pressure, mild heart attack." Ex. A. As of on or about January 14, 2021, BOP had not yet taken a position on Scalea's request. While Scalea's request to BOP was still pending as of January 14, 2021, 30 days have passed since BOP received the request so this Court may consider the merits of Scalea's motion for compassionate release.

### IV. Scalea Presents No Extraordinary or Compelling Reason for Compassionate Release.

#### A. Legal Standard

If the exhaustion requirement is met, the Court may reduce a defendant's term of imprisonment "after considering the factors set forth in [18 U.S.C. § 3553(a)]," if the Court finds, as relevant here, that: (i) "extraordinary and compelling reasons warrant such a reduction"; and (ii) "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A)(i). As the movant, Scalea bears the burden to establish that he is eligible for a sentence reduction. *United States v. Jones*, 836 F.3d 896, 899 (8th Cir. 2016); *United States v. Green*, 764 F.3d 1352, 1356 (11th Cir. 2014); *United States v. Epstein*, Crim. No. 14-287 (FLW), 2020 WL 1808616, at *2 (D.N.J. Apr. 9, 2020).

The relevant policy statement issued by the Sentencing Commission provides that a court may reduce the term of imprisonment after considering the Section 3553(a) factors if the Court finds that: (1) "extraordinary and compelling reasons warrant the reduction"; (2) "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)"; and (3) "the reduction is consistent with this policy statement." U.S.S.G. § 1B1.13.

The policy statement includes an Application Note that specifies the types of medical conditions that qualify as "extraordinary and compelling reasons." First, the standard is met if a defendant is "suffering from a terminal

illness," such as "metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, [or] advanced dementia." Application Note 1(A)(i) to U.S.S.G. § 1B1.13.  Second, the standard is met if the defendant is:

> (I)   suffering from a serious physical or medical condition,
>
> (II)  suffering from a serious functional or cognitive impairment, or
>
> (III) experiencing deteriorating physical or mental health because of the aging process,
>
> that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he is not expected to recover.

Application Note 1(A)(ii) to U.S.S.G. § 1B1.13.  The Application Note also sets out other conditions and characteristics that qualify as "extraordinary and compelling reasons" related to the defendant's age and family circumstances.  Application Note 1(B)-(C) to U.S.S.G. § 1B1.13.  Finally, the Note recognizes the possibility that BOP could identify other grounds that amount to "extraordinary and compelling reasons."  Application Note 1(D) to U.S.S.G. § 1B1.13.

### B.   Scalea's Medical Conditions Do Not Warrant Compassionate Release.

Scalea presents no extraordinary or compelling reason for compassionate release.  In his October 5, 2020 submission, he claims to have "severe asthma, hypertension, high cholesterol, pre-diabetic, and minor heart disease." ECF 25 at 2.  Scalea's supplemental submission provides that Scalea suffers from asthma, hypertension, and high cholesterol, and that, as such, Scalea is "suffering from a serious physical or medical condition" that "substantially diminishes [his] ability" to provide self-care within a correctional facility.  ECF 27 at 3, 5.  Scalea's compassionate release request "essentially asks this Court to find that any individual who has . . . hypertension and asthma and is held in federal prison is experiencing extraordinary and compelling circumstances warranting release.  That conclusion is not warranted." *See United States v. Moye*, Crim. No. 16-250, 2020 WL 6273905, at *2 (S.D.N.Y. Oct. 26, 2020) (denying motion for compassionate release).

Scalea does not fall within the class of people that the Centers for Disease Control ("CDC") considers the most vulnerable to COVID-19.  The CDC does recognize, however, that adults with asthma and high blood pressure "might be at an increased risk for severe illness from the virus that causes

COVID-19."[3] However, Scalea's medical records indicate that he is perfectly capable of taking care of himself and is receiving adequate medical care to monitor and address his conditions. More specifically, according to his medical records, his blood pressure is "well-controlled" and he does not appear to be at risk for diabetes. Ex B at 1.[4] According to the notes from his May 15, 2020 clinical encounter, "Patient states he is doing well. He says his Asthma seems [to] be okay" and his "Blood pressure is doing well." Ex. B at 5. Moreover, Scalea has been prescribed medication for high blood pressure and to control his asthma. ECF 27 at 3. Scalea's medical records also note that his "10-year risk of heart disease or stroke" is less than 10 percent. Ex. B at 1.

Courts in this district and around the country have denied compassionate release, and other similar requests for relief, in circumstances similar to Scalea's, including where the inmate has a medical condition or conditions that the CDC continues to recognize might increase the risk of severe illness from COVID-19. *See, e.g., United States v. Brown*, Crim. No. 10-0344, 2020 WL 3833284 (D. Md. July 8, 2020) (finding that inmate's obesity, asthma and hypertension did not constitute an extraordinary and compelling reason for compassionate release and denying inmate's motion); *United States v. Godofsky*, Crim. No. 16-59, 2020 WL 2188047 (E.D. Ky. May 6, 2020) (denying compassionate release motion of 63-year old defendant with high blood pressure, high cholesterol, and asthma); *United States v. Collins*, Crim. No. 14-30038, 2020 WL 2301217, at *1-2 (C.D. Ill. May 8, 2020) (denying § 3582 motion filed by a 61-year-old defendant diagnosed with asthma, high blood pressure, and coronary artery disease, noting that "the COVID-19 pandemic does not warrant the release of every federal prisoner with health conditions that makes him more susceptible to the disease").

In sum, Scalea's medical conditions do not substantially diminish his ability to provide self-care in the prison environment, and he has failed to demonstrate that BOP is incapable of protecting his health. Fort Dix has taken and is continuing to take adequate measures to protect inmates from COVID-19. Scalea's motion should be denied.

## V. The § 3553(a) Factors Strongly Weigh Against Release

Because Scalea has not set forth any cognizable basis for his requested relief, the Court need not reach the question of whether the § 3553(a) factors

---

[3] *See* Centers for Disease Control, People with Certain Medical Conditions, *available at* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited January 21, 2021).

[4] Because of privacy concerns, the Government will submit Scalea's medical records (Exhibit B) separately to the Court and will not file them on ECF.

otherwise justify his release, though the Government respectfully submits that they do not. The Section 3553(a) factors, including: (1) the seriousness of Scalea's crime; (2) Scalea's history and characteristics; (3) the need for his sentence to deter him and others from committing criminal offenses related to child pornography; and (4) the need to avoid a sentencing disparity, all clearly counsel in favor of denying his Motion.

First, Scalea's crime was serious. 18 U.S.C. §§ 3553(a)(1) and (a)(2)(A). On August 31, 2017, Scalea engaged in an online chat, in an incest chatroom, with a law enforcement officer working in an undercover capacity ("UC"). PSR ¶¶ 17, 20.[5] Scalea represented to the UC that he was sexually active with his 12-year old granddaughter and that he had pictures he was willing to share with the UC. PSR ¶¶ 17, 20. Later that same day, Scalea and the UC engaged in an email exchange, during which Scalea sent the UC an image depicting child pornography, and claimed that the prepubescent female in the image was his granddaughter whom he had been sexually assaulting and raping since she was an infant. PSR ¶¶ 18-19, 21.

On October 5, 2017, law enforcement officers executed a search warrant at Scalea's residence. PSR ¶ 22. At the residence, law enforcement discovered computer devices that belonged to Scalea, which contained hundreds of images of child pornography. PSR ¶¶ 22, 88. A forensic review of the devices seized from Scalea's residence revealed that Scalea possessed images depicting the sexual abuse or exploitation of an infant or toddler, images depicting prepubescent minors, an image portraying sadistic or masochistic conduct or other depictions of violence, as well as more than 500 chat messages that law enforcement bookmarked as related to crimes against children. PSR ¶¶ 87-93. As this Court is already aware, the market for child pornography causes grave harm to the victims featured in these images and videos. These victims are innocent children, and later, adults, who live the rest of their lives knowing that digital records of their abuse and humiliation will continue to be traded like a commodity.

Second, Scalea's history and characteristics weigh against early release. The investigation revealed that the instant offense was not an isolated instance. Scalea admitted to law enforcement that prior to his arrest he frequented an incest chatroom containing images of children ages five through eighteen, and would sometimes spend multiple hours in the incest chatroom during the day. PSR ¶¶ 23, 31. Scalea also admitted to law enforcement that he downloaded and transmitted images of child pornography, and masturbated to the images of child pornography found in his residence. PSR ¶¶ 23-24, 32-33. Moreover, a forensic

---

[5] "PSR" refers to the Final Presentence Report prepared in this matter, dated January 23, 2019.

search of Scalea's computer devices revealed more than 500 chat messages that law enforcement tagged as related to crimes against children. PSR ¶ 88.

Third, the need for deterrence weighs heavily against early release. 18 U.S.C. §§ 3553(a)(2)(B)-(C). Scalea has a persistent and proven sexual attraction to children, which he acts upon by downloading and transmitting images of child pornography. Scalea therefore presents a danger to some of the most vulnerable and unsuspecting members of the public—children. A substantial period of incarceration will protect the public from the very real risk that Scalea could engage in further criminal activity. *See* 18 U.S.C. § 3553(a)(2)(C). Moreover, the need to deter others from committing similar offenses is particularly acute here, given the ready supply of these images available on the Internet, and the ease with which individuals such as Scalea can revictimize these child victims every time one downloads and views the evidence of their sexual exploitation. A reduction in sentence here would not sufficiently serve to deter Scalea and others from engaging in future, similar conduct.

Finally, a reduction in Scalea's 120-month sentence will create sentencing disparities. *See* 18 U.S.C. § 3553(a)(6). Here, Your Honor imposed a sentence within the Guidelines range applicable to the offense level set forth in the parties' plea agreement. Scala has only served about 38 percent of that sentence and should not be relieved from serving the remainder.

In sum, compassionate release would not promote the interests of sentencing, and Scalea's motion should be denied on these grounds.

### VI. The Court Cannot Direct the BOP to Place Scalea on Home Confinement

Finally, were this Court to read Scalea's motion as a request to order BOP to place him on home confinement under the guidelines set forth in the Attorney General's March 26 and April 3, 2020 memoranda,[6] this Court should deny the request. District courts have no authority to direct BOP to place a defendant in home confinement. *United States v. Voda*, 994 F.2d 149, 151-52 (5th Cir. 1993). Rather, such designation decisions are committed solely to BOP's discretion. *See* 18 U.S.C. § 3621(b); *Moore v. United States Att'y Gen.*, 473 F.2d 1375, 1376 (5th Cir. 1973) (*per curiam*); *see also McKune v. Lile*, 536 U.S. 24, 39 (2002) (plurality opinion) ("It is well settled that the decision where to house inmates is at the core of prison administrators' expertise.").

Moreover, a prisoner has no constitutional right to confinement in any particular place, including in home confinement. *See Sandin v. Conner*, 515 U.S. 472, 478 (1995) ("the Due Process Clause did not itself create a liberty interest

---

[6] Memoranda available at: https://www.bop.gov/coronavirus/faq.jsp.

in prisoners to be free from intrastate prison transfers."); *Meachum v. Fano*, 427 U.S. 215, 224 (1976) ("The conviction has sufficiently extinguished the defendant's liberty interest to empower the State to confine him in *any* of its prisons."). And Section 3582(c)(1)(A) permits only a reduction in "the term of imprisonment," not a change in the place of imprisonment. Home confinement merely permits the inmate to serve out the term of imprisonment at home. Such a request therefore falls outside § 3582(c)'s limited grant of authority to this Court to modify a sentence post-conviction. Absent any other statutory authority—and Scalea cites none—this Court has no authority to grant such relief in this forum.

## VII. Conclusion

Accordingly, this Court should deny Scalea's motion for compassionate release.

Respectfully submitted,

RACHAEL HONIG
Acting United States Attorney

By: /s/ Catherine R. Murphy
_____
Catherine R. Murphy
Assistant U.S. Attorney

cc: David Holman, Esq.
    Counsel for Richard Scalea